**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANE DOE INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, c/o Bocchetto & Lentz, P.C., 1524 Locust Street Philadelphia, PA 19102 | : : : : : : | No. **NOTICE OF REMOVAL** Filed Electronically |
| Plaintiff, | : : | |
| v. | : : | |
| REDEEMER HEALTH 667 Welsh Road Huntingdon Valley, PA 19006 | : : : : | |
| and | : : | |
| HOLY REDEEMER HEALTH SYSTEM 667 Welsh Road Huntingdon Valley, PA 19006 | : : : : : | |
| Defendants. | : : | |

<u>**NOTICE OF REMOVAL**</u>

        Plaintiff's case seeks to undermine the substantial efforts of Defendants Redeemer Health and Holy Redeemer Health System (collectively, "Redeemer Health") to fulfill longstanding federal policy to expand the use of electronic health records ("EHR") and bring the U.S. health infrastructure into the 21st century. Plaintiff challenges common methods by which both the federal government and private healthcare providers seek to increase patient engagement with EHR. In Redeemer Health's case, that engagement occurs largely through two online patient portals: one for information regarding patient hospital stays (the "Hospital Portal") and another for information regarding outpatient services called the My Health Story Patient Portal (the "MHS Portal") (together, the "Patient Portals"). These Patient Portals are a key part of how

Redeemer Health implements a partnership with the federal government, which specifically directs Redeemer Health to achieve increasing benchmarks in the use of interoperable health technology. Meeting these federal benchmarks means raising awareness of the Patient Portals, and Plaintiff now asserts that the means for doing so violate Pennsylvania law. Plaintiff seeks recovery on behalf of a putative class. The claims fail on multiple grounds, including without limitation, that the information at issue is not protected health information. But the assertion of those claims effectively asks a court to intervene in the operation of a federal program and hold that the federal government, Redeemer Health, and most other healthcare systems within Pennsylvania are all violating Pennsylvania law.

Plaintiff's claims belong in federal court. Accordingly, pursuant to 28 U.S.C. §§ 1367, 1441, 1442, and 1446, and with a full reservation of all defenses, Redeemer Health gives notice of the removal of this action originally filed in the Court of Common Pleas of Philadelphia County, Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania. In support of removal, Redeemer Health provides this "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a); *see also Dart Cherokee Basis Operating Co., LLC v. Owens*, 574 U.S. 81, 87 (2014) ("By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure.").[1]

## NATURE OF REMOVED ACTION

1.      On May 11, 2023, Plaintiff—who seeks to proceed anonymously under the pseudonym Jane Doe—filed a complaint in the Court of Common Pleas of Philadelphia County alleging claims related to the operation of Redeemer Health's online Patient Portals and Redeemer

---

[1] Redeemer Health appears here in the exercise of its rights of removal under federal law. Redeemer Health reserves all procedural, substantive, and other defenses, arguments, and claims available in response to the Complaint.

Health's general website, http://www.redeemerhealth.org (collectively, the "Redeemer Health Website").

2.      The Complaint—one of several similar lawsuits that Plaintiff's counsel has filed against health care providers—asserts that routine online practices violate a plethora of state laws. A true and correct copy of the Complaint is attached hereto as Exhibit A.  The online practices alleged here are commonplace features and functions of websites, including those maintained by the federal government and private healthcare providers across the country. Moreover, as one federal court already held in dismissing a similar case with prejudice, the kind of general, public browsing information at issue does not relate to the healthcare of any given individual and does not enjoy any special protection: "Nothing about that information relates specifically to Plaintiffs' health." *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017).

3.      According to Plaintiff, Redeemer Health installed software on its website, including the Meta Pixel and Google Tag Manager, which, Plaintiff alleges, are "automatic re-routing mechanisms" generally which caused information that she characterizes as "protected health information" (PHI) to be automatically transmitted to Meta Platforms, Inc. (formerly Facebook), Google, and other "third parties" when patients used the public website.  *See* Compl. at ¶¶ 30-31, 39, 41, 60, 170.

4.      Despite Plaintiff's conclusory labels, her factual allegations reveal that the allegedly transmitted information is not PHI connected to a person's actual name or medical records, but instead consists of Internet-related metadata that enables the website to function, such as a webpage's Universal Resource Locator (URL) and alleged cookie identifiers.  *Id.* at ¶¶ 39-223.

5.      Nonetheless, Plaintiff speculates that because she used Redeemer Health's public website, Redeemer Health "captur[ed] her personal health information and disclos[ed] that information to Facebook and Google." *Id.* at ¶ 221.

6.      Plaintiff has brought claims, on behalf of herself and a putative class, for: violation of Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa.C.S. § 5701 et seq. (Count I); invasion of privacy – intrusion upon seclusion (Count II); breach of duty of confidentiality (Count III); and unjust enrichment (Count IV).

7.      While the Complaint uses selectively quoted snippets of isolated source code and Redeemer Health's privacy disclosures in an attempt to create an impression of impropriety, none of the factual allegations give rise to a cognizable claim.

8.      Redeemer Health uses health information technology ("health IT"), certified by the federal government, to provide patients and their proxies access to the Patient Portals as a way to manage their healthcare directly through secure online platforms. The innovative Patient Portals allow users, among other things, to view and download medical records to keep or share with other providers for coordination of care.  The MHS Portal allows patients to securely communicate with providers and manage their healthcare, such as by requesting changes to their appointments, reviewing their medications lists, and paying bills. None of *that* information is shared with outside third parties except as is expressly permitted under federal law.

9.      The claims in this lawsuit thus suffer from myriad defects under both federal and state law. But Plaintiff's claims also implicate unique federal interests, making this case removable to federal court.

10.      Since at least 2004, the federal government has—through executive order, major legislation, and administrative programs—overseen the development of a nationwide

infrastructure for health IT and EHR. To achieve that goal in large part, the federal government has established its own patient portal for federal Medicare beneficiaries and sought to steadily increase its utilization among patients through targeted advertising.

11.     The federal government has also encouraged private healthcare providers to develop and maintain their own patient portals and has made special federal payments to those providers that voluntarily endeavor to expand patients' use of portals and access to EHR in meaningful ways. This case challenges the legality of techniques and practices that the federal government and the providers it pays use to meet that goal. The action is therefore removable pursuant to the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1).

### VENUE

12.     Removal to this District is proper because this Court embraces Philadelphia County, Pennsylvania.  28 U.S.C. §118(c).

### BASES FOR REMOVAL

13.     Removal is proper under the Federal Officer Removal statute, 28 U.S.C. § 1442(a)(1).

14.     The Federal Officer Removal statute permits removal where the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).

15.     The Federal Officer Removal statute is to be broadly construed to allow defendants to remove whenever they are acting under color of federal office. *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981); *State of Colorado v. Symes*, 286 U.S. 510, 517 (1932); *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Def. Ass'n*") (citing *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007)); *see*

*also Willingham v. Morgan*, 395 U.S. 402, 405 (1969) (noting scope of federal officer removal "is not narrow or limited").

16.     To remove a case under the Federal Officer Removal statute, a defendant must show that (1) it is a "person" within the meaning of the statute; (2) it is "acting under" a federal officer's authority; (3) the plaintiff's claims are "for, or relating to an act under color of federal office"; and (4) the defendant can assert a "colorable federal defense" to the plaintiff's claims. *Golden v. New Jersey Inst. of Tech.*, 934 F.3d 302, 309 (3d Cir. 2019) (internal quotations omitted); *see also Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016).[2]

17.     Removal under the Federal Officer Removal statute is proper here because Redeemer Health and Holy Redeemer Health System meet all four of the statute's requisite elements for removal.  *Def. Ass'n*, 790 F.3d at 467 (holding that state-court disputes were properly removed where they pertained to how a Pennsylvania non-profit administered authority delegated to it under federal law and how it utilized related federal funds).  *See also Golden*, 934 F.3d at 309-310 (holding removal proper where the dispute implicated governmental confidentiality interests under federal law); *Doe I v. UPMC*, No. 2:20-359, 2020 WL 4381675, at *7 (W.D. Pa. July 31, 2020) (holding removal proper where plaintiff alleged state wiretapping and other claims against health care provider for its use of patient portals pursuant to federal Meaningful Use Program).  *But see Mohr v. Trustees of Univ. of Pennsylvania*, No. 23-731, 2023 WL 3044594, at *1 (E.D.

---

[2]     When Congress amended § 1442(a)(1) in 2011 to reach removal based on a claim "for or relating to any act under color of [federal] office," *see* Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545, the "addition of the words 'or relating to' in the 2011 revision of the statute … was intended to 'broaden the universe' of acts that enable Federal officers to remove [suits] to Federal court." *Papp*, 842 F.3d at 813. Accordingly, the Third Circuit and other federal circuits "have consistently given this requirement a broad reading and held that no causal link [between the official act and the plaintiff's alleged injury] is required." *See Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022).

Pa. Apr. 20, 2023) (declining to exercise federal officer jurisdiction over state wiretap act claim asserted against health care provider).

18.     The federal government has incentivized and directed providers that participate in the Medicare and Medicaid program (like Redeemer Health) to offer patients online access to their records, and to optimize patient engagement with their medical information.

19.     The federal government has also modeled the behavior it wants to see from providers by creating a portal for Medicare beneficiaries and employing the same strategies of which Plaintiff complains in this action.

20.     Redeemer Health has dutifully assisted and followed the federal government's direction in this effort, including through the actions of which Plaintiff complains here.  In doing so, it has acted within the penumbra of federal action and office.  Accordingly, pursuant to the Supreme Court's directive that the statute must be construed broadly, the requirements of the Federal Officer Removal statute are satisfied.

### A.     Redeemer Health is a "Person."

21.     Any "person" acting under a federal officer may remove an action to federal court pursuant to Section 1442(a)(1).

22.     "Because the statute does not define 'person,' [courts] look to 1 U.S.C. § 1, which defines the term to 'include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'" *Def. Ass'n*, 790 F.3d at 467.

23.     Defendants are both Pennsylvania non-profit corporations. *See* Compl., at ¶¶ 8-9. They therefore qualify as persons for removal purposes. *Def. Ass'n*, 790 F.3d at 468 ("As a non-profit corporation, the Defender Association of Philadelphia falls within this definition.").

**B.    Redeemer Health is Acting Under a Federal Officer.**

24.    The 'acting under' requirement, like the Federal Officer Removal statute overall, "is to be liberally construed to cover actions that involve an effort to assist, or to help carry out, the federal supervisor's duties or tasks." *Papp*, 842 F.3d at 812 (marks and citation omitted). The question is not whether the specific conduct alleged in the Complaint was itself "at the behest of a federal agency. It is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between" the defendant and the federal government. *Def. Ass'n*, 790 F.3d at 470.

25.    Redeemer Health owns multiple healthcare facilities and employs more than 160 multispecialty physicians/providers (collectively, the "Redeemer Health Providers") that operate in 54 clinical locations, serving more than 300,000 patients. *See* About Redeemer Health, attached hereto as Exhibit B.

26.    The allegations here squarely target the relationship between the Redeemer Health Providers and the federal government.

27.    The federal government is incentivizing, regulating, monitoring, and supervising Redeemer Health's actions in the Meaningful Use program to meet the federal government's national priority of interoperable health information technology.

28.    As one of the largest purchasers of healthcare services, the federal government has a unique interest in health IT.

29.    Redeemer Health (along with many other healthcare entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information.

30.    The federal government itself has repeatedly acknowledged the private sector's essential role in this project, most recently stating that the federal government and the private sector "have worked together to help digitize health information and healthcare."  *See* Office of

the Nat'l Coordinator for Health Info. Tech., *2020-2025 Federal Health IT Strategic Plan* ("2020-2025 Strategic Plan"), attached hereto as Exhibit C, at 8.

31.    The federal government plays a central role in healthcare in the United States generally, and in the use of health IT in particular.

32.    Through the Department of Veteran Affairs ("VA"), the Department of Health and Human Services ("HHS"), and the Centers for Medicare & Medicaid Services ("CMS"), the federal government pays directly for, or subsidizes, healthcare for tens of millions of people through massive programs like traditional Medicare, Medicare Advantage, and Medicaid. Overall, the federal government is one of the largest purchasers of healthcare services, spending over $1 trillion each year.

33.    To protect its interests, the federal government has emphasized the important role that health IT plays in improving both the quality and efficiency of healthcare in the United States. As a federal officer within HHS recently explained:

> Federal agencies are purchasers, regulators, developers, and users of health IT.  They fund and contribute to health IT research, health IT development, and health IT deployment at the local, Tribal, state, and national levels. Federal agencies also facilitate coordination across the public and private sectors to align standards, encourage innovation, share best practices, and promote competition.  In addition, they have the responsibility of developing regulations that impact health IT and providing oversight for its use.  Beyond actions aimed at strengthening the health IT infrastructure and lowering barriers to access, exchange, and use of EHI, federal agencies use health IT to achieve their missions and serve the nation every day. For example, agencies use EHRs, data systems, and other health IT to conduct public health surveillance and research, provide healthcare services to patients, and administer government benefit programs such as Medicare and Medicaid.

2020-2025 Strategic Plan (Exhibit C) at 8.

34.     To promote its efforts to digitize information and increase patient engagement with Medicare beneficiaries, the federal government makes special payments to Redeemer Health Providers that increase patient engagement with EHR through the use of online portals.

35.     As set forth in more detail below, Plaintiff's allegations pertaining to the design and functionality of the Redeemer Health Website implicate how Redeemer Health Providers execute this federal program, meet federally mandated criteria regarding health IT, and qualify for federal payments.

36.     The federal government has also established specific offices to expand the use of EHR and other health IT. First, the government established the National Health Information Technology Coordinator by executive order. *See* Exec. Order 13335 (Apr. 27, 2004). That office was charged with overseeing "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id*.

37.     Congress then codified this model in the Health Information Technology for Economic and Clinical Health Act of 2009 ("HITECH Act"). That legislation created the Office of the National Coordinator for Health Information Technology ("ONC") and earmarked billions of federal dollars to help create, among other things, a "[h]ealth information technology architecture that will support the nationwide electronic exchange and use of health information in a secure, private, and accurate manner." 111 P.L. 5 § 3011(a)(1), 123 Stat. 115, 247 (2009) (codified at 42 U.S.C. § 300jj-31).

**1.      Achieving the federal government's objectives for health IT requires partnering with healthcare providers.**

38.     The federal government has enlisted private providers—including Redeemer Health Providers—to help build its nationwide health IT infrastructure.  In doing so, it has closely

monitored the work of private entities (like Redeemer Health) and supervised the general development of this information technology infrastructure.

39.     The government "is pursuing a vision of a learning health system, in which a vast array of health care data can be appropriately aggregated, analyzed, and leveraged using real- time algorithms and functions." *See* ONC, *Federal Health Information Technology Strategic Plan 2011-2015*, attached hereto as Exhibit D, at 5. Achieving that vision requires the widespread adoption and meaningful use of EHR, which—in turn—requires collaboration with the private sector. *See id*. at 1, 4, 8.

40.     In particular, healthcare providers are uniquely positioned to encourage individual patients to access and use EHR. After all, there is no point to developing a nationwide health IT infrastructure if an insufficient number of patients use the system. The government has thus sought to enhance "a provider's ability to influence patient engagement by providing a wider range of technologies and methods for a patient's use." 80 Fed. Reg. 62848.

41.     The government also sets federal specifications for the development of certified EHR technology ("CEHRT"). Private healthcare software companies design, develop, and maintain electronic systems necessary to support EHR databases. The federal government sets the standards and technical specifications that such technology must meet. *See* 45 C.F.R. § 170.315. Once ONC certifies that a particular developer's product complies with these standards, that developer can market the product to providers as CEHRT. The government in turn requires that providers use CEHRT in certain instances.

42.     With this framework in place, the federal government has spent the last decade actively seeking to expand the use of EHR and CEHRT among healthcare providers and patients. Its primary method for doing so has been HHS' voluntary EHR Incentive Program, also known as

the Meaningful Use Program. *See* ONC, *Federal Health Information Technology Strategic Plan 2011-2015* (Exhibit D) at 4; *see also* CMS, *Promoting Interoperability Programs*, available at https://www.cms.gov/regulations-and-guidance/legislation/ehrincentiveprograms.[3]

      **2.**      **The federal Meaningful Use Program requires participating private healthcare providers to expand the use of EHR and CEHRT.**

43.      The Meaningful Use Program originated in the HITECH Act, which created an incentive for providers to adopt the "meaningful use" of CEHRT and delegated to HHS the authority to set criteria for determining meaningful use. Pub. L. No. 111-5 § 4101, 123 Stat. 115, 467 (2009) (codified at 42 U.S.C. § 1395w-4).

44.      HHS structured the ensuing Meaningful Use Program in three stages. The first stage encouraged providers to adopt EHR and established specific objectives for its use. Subsequent stages gradually increased the criteria for meeting those objectives and demonstrating that patients continued to access and use EHR in greater numbers. *See* 75 Fed. Reg. 44321-22 (describing the three stages).

45.      To meet the federal criteria, providers who participate in the program, like Redeemer Health, have been required to both adopt EHR and CEHRT, and to show patients' increasing engagement over time. Providers who met the criteria at each stage qualified for higher federal payments from the government. *See* 42 U.S.C. § 1395w-4.

46.      For instance, one objective of the Meaningful Use Program has been to "[p]rovide patients the ability to view online, download, and transmit their health information within 4 business days of the information being available…." 80 Fed. Reg. 62815. Compliance at Stage 2 required showing that more than 50 percent of Medicaid patients received access to view online,

---

[3] *Last visited* June 11, 2023.

download, and transmit to a third party their health information. That percentage increased to "more than 80 percent" for Stage 3.[4]

47.     Another objective has been to encourage the "capability for patients to send and receive a secure electronic message" with their doctor. 80 Fed. Reg. 62818. Stage 2 required only the *capability* for patients to send and receive a secure electronic message. The 2019 requirements for Stage 3 required showing that a certain percentage of patients were actually using the capability.[5]

48.     The ONC has also issued a "Patient Engagement Playbook" as a "tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals – to engage patients in their health and care."  ONC, *Patient Engagement Playbook* (last updated May 31, 2019), available at https://www.healthit.gov/playbook/pe/.[6]

### 3.     Patient portals are the means by which the healthcare industry—including the federal government—encourages the use of EHR.

49.     Online patient portals have been the most effective and efficient way to meet many of the objectives in the federal Meaningful Use Program. CMS anticipated this in some of its earliest rulemaking on the Program. In announcing Stage 1 objectives for providing "patients with

---

[4] *Compare* CMS, *Medicaid EHR Incentive Program, Modified Stage 2 Patient Electronic Access* (Nov. 2016), attached hereto as Exhibit E, *with* CMS, *Medicaid EHR Incentive Program, Modified Stage 3 Patient Electronic Access to Health Information* (Aug. 2017), attached hereto as Exhibit F.  In developing this "phased approach," the federal government "intend[ed] to update the criteria of meaningful use" as the program progressed, 75 Fed. Reg. 44321, and specifics about the criteria, relevant measures, and potential exclusions could vary over time and according to provider.  The overall goal of developing interoperable health IT and increasing patient engagement with EHR has remained constant.  *See* ONC, 2020 Strategic Plan (Exhibit C) at 17-18 (discussing the ongoing goal of interoperable health IT infrastructure).

[5] *Compare* CMS, *EHR Incentive Programs for Eligible Professionals: What You Need to Know for 2015 Tipsheet*, attached hereto as Exhibit G, *with* CMS, *Eligible Professional Medicaid EHR Incentive Program Stage 3 Objectives and Measures Objective 6 of 8*, attached hereto as Exhibit H.

[6] *Last visited* June 22, 2023.

timely electronic access to their health information," CMS intended "that this be information that the patient could access on demand such as through a patient portal…." 75 Fed. Reg. 44356.

50.     The utility of portals continued as the criteria for showing patient engagement developed. *See* 77 Fed. Reg. 54007 ("Consistent with the Stage 1 requirements, we noted that the patient must be able to access this information on demand, such as through a patient portal or personal health record (PHR)"); *id*. at 54009 (noting that "[m]any CEHRT vendors already make patient portals available that would meet the certification criteria"); CMS, *Medicaid Promoting Interoperability Program Eligible Professionals Objectives and Measures For 2020 Objective 5 of 8*, attached hereto as Exhibit I (setting program objectives for 2020, including that providers give patients "timely electronic access to their health information … on demand, such as through a patient portal").

51.     Indeed, before Stage 2 took effect, ONC advised that providers "will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively in your practice operations," and that "stage 3 requirements may require that you use a patient portal to attest successfully." ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements*, attached hereto as Exhibit J.

52.     Given the goal of increasing patient engagement, it was also not enough just to make "a portal available to patients…. The portal must be engaging and user-friendly, and must support patient-centered outcomes." *Id*. Driving providers to increase patient engagement and the use of EHR has been a foundation of establishing the nationwide, interoperable health IT infrastructure first envisioned in 2004.

53.     For instance, CMS maintains its own patient portal for individuals who access care through traditional Medicare—MyMedicare.gov. The VA maintains its own portal for veterans, My HealtheVet.

54.     CMS uses third-party cookies, analytics, and targeted advertising to increase patient engagement with its portal through outreach and site improvements. *See* Medicare.gov, *Privacy Policy*, available at https://www.medicare.gov/privacy-policy.[7] That includes many of the same third-party cookies, analytics, and targeted advertising alleged as unlawful in the Complaint.

55.     CMS, in fact, identifies 23 separate third parties that it uses for advertising, web analysis, social media outreach, and privacy management in conjunction with Medicare.gov and MyMedicare.gov. *See* Medicare.gov, *Privacy Information Regarding Third-Party Services*, available at https://www.medicare.gov/third-party-privacy-policies.[8] These include, for instance:

    a.  At least one vendor—Resonate—to provide "behaviorally targeted advertising on third party websites to encourage consumers to visit MyMedicare.gov";

    b.  The use of "Web Beacons and Persistent cookies for Digital Advertising" through nine different entities;

    c.  The use of Bing, Facebook, LinkedIn, Google, Pandora, Twitch, Instagram, Spotify, and Snapchat, among others, to deploy digital display ads and targeted ads to both new users and users who have visited Medicare.gov and CMS.gov;

    d.  Employing Google Analytics to collect and analyze "data on visitor interactions with MyMedicare.gov to help make the site more useful to visitors"; and

    e.  Employing six other outside vendors that analyze traffic on MyMedicare.gov, assess visitor interactions, or otherwise monitor site functionality.

56.     CMS advises that its vendors "may use information collected automatically by visiting Medicare.gov, and combine it with data they collect elsewhere for targeted advertising

---

[7] *Last visited* June 11, 2023.

[8] *Last visited* June 11, 2023.

purposes." *See* Medicare.gov, *Privacy Policy*. CMS collects user information such as the device used, IP address, geographic location, pages visited, and "Your actions on Medicare.gov (like clicking a button)," and uses that data to improve visitors' experience, optimize website content, and *"*personalize the content we show you on third-party sites." *Id.*

57.    As CMS explains this practice: "During a visit to Medicare.gov, a cookie is placed in the browser of the devices used to view the website. When that same device is used to visit third-party websites that are displaying Medicare.gov ads, ads for Medicare.gov may be shown to that device because it had previously visited Medicare.gov." *Id*. Such "tools enable [CMS] to reach new people," thus potentially expanding the use of EHR even further. *Id.*; *compare also* Compl. at ¶ 198; ¶ 217 (parallel allegations from Plaintiffs' Complaint about the use of cookies).

**4.    Redeemer Health Providers have been expanding the use of EHR and receiving incentive payments from the federal government under the Meaningful Use Program.**

58.    Redeemer Health Providers have been part of the federal Meaningful Use Program since 2013. *See* Declaration of Donald F. Friel ("Friel Decl."), attached hereto as Exhibit K, at ¶ 4. The federal government pays Redeemer Health Providers for meeting program criteria and expanding patients' access to and use of EHR. *Id*. at ¶ 10.

59.    The Patient Portals are the means by which Redeemer Health Providers meet certain requirements of the federal Meaningful Use Program. *Id.* at ¶ 10.  The Patient Portals are digital platforms accessible online that give patients and their proxies the ability to manage their healthcare directly by, for instance: viewing their electronic health records (including doctors' notes, laboratory reports and medical imaging reports), and downloading records to keep or share with other providers.  The MHS Portal also allows patients to electronically communicate with their physicians through secure messaging, and manage their healthcare, such as by requesting changes to their appointments, reviewing their medication list, and paying bills.  *Id.* at ¶ 6.

60.     Redeemer Health utilizes federally certified EHR technology vendors to support the Patient Portals. *Id.* at ¶ 7.  Redeemer Health's vendors are commonly used and well-respected CEHRT vendors in the healthcare industry. The federal government certifies these vendors' products, including their security, according to the federal Health IT Certification Criteria. *See* 45 C.F.R. § 170.315.

61.     In order for Redeemer Health Providers to meet the criteria in the Meaningful Use Program, it is paramount both that patients know about the portal, and that their experience using the portal be—in the words of ONC—"engaging and user-friendly." ONC, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (Exhibit J) at 1; *see also* Friel Decl., ¶ 8-9.

62.     Redeemer Health uses common web practices to communicate with patients about the Patient Portals across relevant websites (including Redeemer Health's own general, publicly available website, https://www.redeemerhealth.org) and improve website functionality.

63.     These practices are also commonly found on websites maintained by CMS, other federal health agencies, private health insurers, and other health providers.

64.     For example, in addition to MyMedicare.gov, described above, other federal healthcare websites also utilize targeted marketing, web beacons, and Google Analytics or other analytic resources. These include **www.healthcare.gov** (where consumers can purchase insurance); **www.opm.gov/healthcare-insurance/healthcare** (where federal employees can manage their health plans); and **www.ssa.gov** (where people can manage their social security benefits). *See* CMS privacy notice for HealthCare.gov, available at https://www.healthcare.gov/privacy/; Office of Personnel Management, Information Management Privacy Policy, available at https://www.opm.gov/information-management/privacy-

policy/#url=Web-Privacy-Notice; Social Security Administration Internet Privacy Policy, available at https://www.ssa.gov/agency/privacy.html.[9]

65.     Redeemer Health Providers have met federal Meaningful Use Program criteria because of their use of the Patient Portals. Friel Decl., ¶ 10.

66.     Redeemer Health provides healthcare to thousands of patients, including those receiving care under federally-subsidized Medicaid and Medicare Advantage insurance policies, every day.  Patients who receive care from Redeemer Health Providers have their electronic records stored with Redeemer Health's CEHRT vendors, and are eligible to sign up for the Redeemer Health Patient Portals to help manage their care. When they do so, it furthers the federal government's policy and allows those patients immediate access to view their electronic records and, if they choose, share that data with another provider or with the federal government. That is the burgeoning nationwide interoperable health IT infrastructure at work.

67.     The federal government partners with healthcare providers like Redeemer Health to deliver "a service the federal government would itself otherwise have to provide." *Def. Ass'n*, 790 F.3d at 469. The government delegates to those healthcare providers the responsibility for executing the Meaningful Use Program, expanding the use of EHR, and developing the nationwide health IT infrastructure. *Id.* (noting propriety of removal where "'Defendants received delegated authority'" (citation omitted)).

68.     Through its own engagement with third-party services, the federal government has modeled the behavior that private entities are to follow.

69.     Redeemer Health's alleged use of techniques identified in the Complaint in this case relates to how Redeemer Health would carry forth its delegated authority. Indeed, Redeemer

---

[9] *All websites last visited* June 11, 2023.

Health was acting under the authority of HHS and its agencies and officers in encouraging use of those Patient Portals to patients online. *See* Friel Decl., ¶¶ 8-10; *see also Papp*, 842 F.3d at 812 ("When, as occurred in this instance, the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete, that contractor is acting under the authority of a federal officer." (marks and citation omitted)); *Doe I v. UPMC*, No. 2:20-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020) ("UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria. … Plaintiffs' Complaint addresses the design and functionality of UPMC's website and patient portal, implicating UPMC's implementation of the Meaningful Use Program, particularly as the implementation involves patient engagement and usership. … UPMC is therefore 'acting under' a federal superior for purposes of the federal officer removal statute.").

### C.    Plaintiff's Claims Relate to Actions Under Color of Federal Office.

70.    For removal pursuant to Section 1442(a)(1), the alleged conduct must "have been undertaken 'for or relating to' a federal office." *Papp*, 842 F.3d at 813. To satisfy this aspect of removal, "it is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office." *Def. Ass'n*, 790 F.3d at 471; *see also Papp*, 842 F.3d at 813 (holding recent amendments to statute have fostered "a more permissive view" of this element).

71.    Any single claim is independently sufficient to satisfy the "for or relating to" requirement of § 1442(a)(1).  *See, e.g.*, *Moore*, 25 F.4th at 35.

72.    That low bar is met here.

73.    Plaintiff directly challenges Redeemer Health's website analytics practices, as well as its alleged (a) tracking of online behaviors through source code and cookies and (b) use of marketing companies such as Facebook to promote online patient engagement.

74.     More specifically, Plaintiff alleges that using common online tools to communicate with consumers about patient portals violates federal and state law. According to the Complaint, IP addresses and the cookies and browser fingerprints that allegedly track web users are protected health information. In allegedly deploying techniques to promote awareness of and registration for the Patient Portals and make them more engaging, Redeemer Health is purportedly intercepting and disclosing patient medical data to Facebook in violation of Pennsylvania's wiretapping act. *See* Compl. at ¶¶ 313-327.

75.     Plaintiff also claims that the use of software code to promote targeted communications deployed to encourage greater engagement with the Patient Portals, just like that used by CMS and widely relied on throughout the healthcare industry, "intentionally intruded upon the private concerns" of Plaintiff and the putative class in their "personal health information" (*id.* at ¶ 332) and breached Redeemer Health's duty of confidentiality.  *Id.* at ¶ 365.

76.     Finally, Plaintiff claims that the targeted communications and analytic techniques alleged here have unjustly enriched Redeemer Health. *Id.* at ¶¶ 369-374.  According to the Complaint, patients have "property rights in their health data and communications" as "established by HIPAA and state health privacy laws[,]" (*id.* at ¶ 265) and providers like Redeemer Health have purportedly deprived Plaintiff and the putative class "of the economic value of their sensitive medical information[.]"  *Id.* at ¶ 281.

77.     These allegations are inextricably tied to—and certainly "connected" and "associated" with—Redeemer Health's effort to meet federal Meaningful Use Program criteria. *Def. Ass'n*, 790 F.3d at 471; *Doe I*, No. 2:20-359, 2020 WL at *6.

78.     Plaintiff is challenging common efforts by which CMS and others expand the use of EHR.  The Meaningful Use program envisions these activities, as evidenced by the federal government's own use of these codes and third parties for its Medicare website.

79.     If Plaintiff was to prevail in showing that common online methods for meeting Meaningful Use benchmarks violate law, it would substantially interfere with achieving the policy objectives set forth in the HITECH Act and its implementing regulations.  *See, e.g.*, *Doe I*, No. 2:20-359, 2020 WL at *6 ("Plaintiffs' allegations target mechanisms by which UPMC manages and markets its website and patient portal. There is plainly a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiffs' claims are therefore 'for or relating to' an act under color of federal office.").

80.     As the Court in *Doe I* emphasized, a private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id.* at *7.  It is "not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope of the private entity's duties is the very thing that should be left to a federal court to decide." *Id.*

81.     Here, as in *Doe I*, "[t]here is plainly a connection between [Redeemer Health's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and useability.  Plaintiff's claims are thus 'for or relating to' an act under color of federal office." *Id.*

**D.      Redeemer Health Raises Colorable Federal Defenses to Plaintiff's Claims.**

82.      The final element for federal officer removal requires that the defendant identify a federal defense. *Def. Ass'n*, 790 F.3d at 472. This, too, is broadly construed in favor of federal jurisdiction. *Id*. at 472-74.

83.      Arguments that federal law preempts state law suffice to warrant removal under this element. *Id*. at 473-74. Similarly, where a complaint alleges the presence of a duty under federal law, a federal defense exists for removal purposes where the defendant denies it violated any such duty. *Id*. at 473 (holding this element satisfied because defendant "claim[ed] that it was not violating the terms of" a federal statute); *see also Golden*, 934 F.3d at 311 (holding that defendant raised a colorable federal defense by denying that the records at issue "are federal records within the meaning of 44 U.S.C. § 3301"); *Doe I*, No. 2:20-359, 2020 WL at *6 (holding provider satisfied this element where it asserted, in response to various claims surrounding use of its website and patient portal, that it would raise various colorable federal defenses, including a duty-based defense under HIPAA, preemption, and the dormant Commerce Clause).

84.      A "colorable federal defense" need not be "clearly sustainable," but rather, is sufficient unless it is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous." *Moore*, 25 F.4th at 37. *See also Willingham v. Morgan*, 395 U.S. 402, 406-07 (1969) (defendants "need not win [their] case before [they] can have it removed" on the basis of federal officer removal jurisdiction).

85.      By way of illustration and without limitation, Redeemer Health will assert several colorable federal defenses to the claims at issue here.

86.      *First*, Redeemer Health will contend that the data at issue here is not subject to HIPAA, contrary to the allegations in the Complaint. *See* Ex. Compl. at ¶ 111. Plaintiff does not allege the disclosure of medical records or secure communications between patients and

physicians. This case instead concerns generic online information that is anonymous or linked only to a specific computer, not a person. *See Smith*, 262 F. Supp. 3d at 954-55 (holding that IP addresses and similar information did not "relate[] specifically to Plaintiffs' health" and were not "protected health information" under HIPAA).

87.     *Smith* alone makes Redeemer Health's defense of the HIPAA-related allegations colorable and satisfies the final requirement for removal under Section 1442(a)(1). *See also Golden*, 934 F.3d at 311 (holding that a federal defense was present where defendant denied any violation of federal law); *Def. Ass'n*, 790 F.3d at 474 (same); *Doe I*, No. 2:20-359, 2020 WL at *6 (holding provider stated colorable federal defense where plaintiff claimed provider breached duty of confidentiality and elsewhere alleged that duty arose from HIPAA).

88.     *Second*, certain state-law privacy standards are preempted under HIPAA. *See* 45 C.F.R. § 160.203. The possibility of preemption is also enough to present a federal defense for removal purposes. *See Def. Ass'n*, 790 F.3d at 474 (permitting removal on the basis of preemption).

89.     *Third*, the Dormant Commerce Clause blocks states from interfering with interstate commerce. Any "state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989). And "[b]ecause the internet does not recognize geographic boundaries, it is difficult, if not impossible, for a state to regulate internet activities without 'projecting its legislation into other States.'" *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103 (2d Cir. 2003) (citation omitted). Accordingly, the Dormant Commerce Clause presents a colorable federal defense. *Doe I*, No. 2:20-359, 2020 WL at *7 (holding provider stated colorable federal defense based on Dormant Commerce Clause).

90.     Here, Redeemer Health Providers are located in several States, including Pennsylvania and New Jersey. The Redeemer Health Website provides an easily accessible, interstate (and international) platform by which providers, patients, and others can manage or learn more about their healthcare, or healthcare, generally. But according to the Complaint, Pennsylvania law—including the legislative proscriptions of the Commonwealth's wiretapping statute—restricts how Redeemer Health can design and manage its website. The Dormant Commerce Clause prohibits Pennsylvania from reaching beyond its borders in that way.

91.     *Finally*, the entire nature of Redeemer Health's involvement in the Meaningful Use Program is "inherently federal in character because the relationship" between Redeemer Health and HHS "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (holding that state law claims stemming from defendant's representations to a federal agency were preempted). Federal judicial review is available to assess allegations about the nature of that relationship. *See Def. Ass'n*, 790 F.3d at 474 (permitting removal on the basis of *Buckman* preemption); *Doe I*, No. 2:20-359, 2020 WL at *7 ("Having already found that UPMC was 'acting under' DHHS when it engaged in the complained-of conduct, it follows that the relationship between UPMC and DHHS is 'inherently federal' in nature, such that the issue of whether Plaintiffs' state-law claims are preempted under the principles articulated in *Buckman* should be decided by a federal court.").

**COMPLIANCE WITH PROCEDURAL REQUIREMENTS FOR REMOVAL**

92.     Redeemer Health has satisfied all the procedural requirements for removal under 28 U.S.C. § 1446.

93.     Redeemer Health files this Notice of Removal pursuant to 28 U.S.C. § 1441(a) in the United States District Court for the Eastern District of Pennsylvania, because the State court in which the action is pending, the Court of Common Pleas for Philadelphia County, is within this

federal judicial district. This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

94.     Plaintiff served the Complaint on Redeemer Health on or after May 23, 2023. Redeemer Health removed the case within 30 days of that date; therefore, this removal is timely under 28 U.S.C. § 1446(b). *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999).

95.     A copy of "all process, pleadings, orders, and other documents then on file in the State Court," are attached hereto as Exhibit L in accordance with 28 U.S.C. § 1446(a), except for the Complaint filed in the Court of Common Pleas, which is attached hereto as Exhibit A.

96.     In accordance with 28 U.S.C. § 1446(d), promptly after filing this Notice, Redeemer Health will "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Court of Common Pleas of Philadelphia County. A true and correct copy of the Notice to the State Court of Filing of Notice of Removal is attached hereto as Exhibit M.

97.     Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of Redeemer Health's right to assert any and all defenses or objections to the Complaint, including but not limited to Plaintiff's class allegations.

98.     If there are any questions that arise as to the propriety of removal of this action, Redeemer Health respectfully requests the opportunity to submit briefing, argument, and additional evidence as necessary to support removal of this case.

Respectfully submitted,

*/s/ Chelsea A. Biemiller*
STRADLEY RONON STEVENS & YOUNG, LLP
A Pennsylvania Limited Liability Partnership

Jeffrey D. Grossman, Esquire (ID 78537)
William T. Mandia, Esquire (ID 91792)
Chelsea A. Biemiller, Esquire (ID 319625)
2005 Market Street, Suite 2600
Philadelphia, PA 19103
T:      (215) 564-8000
F:      (215) 564-8120
jgrossman@stradley.com
wmandia@stradley.com
cbiemiller@stradley.com
*Attorneys for Defendants,*
*Redeemer Health and Holy*
*Redeemer Health System*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused to be served a copy of the foregoing Notice of Removal, together with all exhibits thereto, on the following counsel via first class mail and electronic mail:

George Bochetto
David P.  Heim
John A. O'Connell
Ryan T. Kirk
Bochetto & Lentz, P.C.
1524 Locust Street
Philadelphia, PA 19102

*/s/Chelsea A. Biemiller*
Chelsea A. Biemiller

Dated:  June 22, 2023

6170903