### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JANE DOE,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **REDEEMER HEALTH AND HOLY** | **NO. 23-2405** |
| **REDEEMER HEALTH SYSTEMS,** | |
| **Defendants.** | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Jane Doe, proceeding pseudonymously on behalf of herself and a putative class of others similarly situated, alleges a range of state law medical privacy violations by Defendants Redeemer Health and Redeemer Health Systems (collectively, "Redeemer"). The crux of her complaint is that Redeemer embeds tracking pixels in the source code of its website and patient health portal, and that these pixels transmit sensitive medical information to third parties without patients' knowledge or consent. Invoking the federal officer removal statute, 28 U.S.C. § 1442, Redeemer removed this action from state court, and presently pending is Doe's motion to remand back. For the reasons that follow, Doe's motion will be granted.

### I.   FACTUAL BACKGROUND

#### A.  Allegations in the Complaint

Doe's complaint alleges the following facts, which are accepted as true in this posture. Redeemer manages a wide range of healthcare facilities, and it owns and operates the website https://www.redeemerhealth.org. Using the patient portal accessible through this website, Redeemer patients can perform tasks like exploring treatment options, making appointments, communicating with providers, and checking test results. Redeemer actively encourages its patients to use these digital tools, and its website assures visitors that "Redeemer does not share

any individual data gathered online with people outside of Redeemer."  Doe was a regular user of Redeemer's website during 2022 and 2023, and she used its patient portal to search for treatment options for her arthritis and gastrointestinal issues.

Notwithstanding its assurance of patient privacy, Redeemer's website incorporates multiple tracking pixels, including the Meta Pixel, and these pixels surreptitiously transmit private medical information to third party companies, including Facebook and Google.  For background, websites consist of "markup," which is the visible portions of a web page, and "source code," which is a set of instructions for the browser when a web page loads or when a specific event triggers the code.   In the case of Redeemer's website, this source code includes tracking pixels that act like physical wiretaps on a phone.  When triggered, they collect user data and funnel it directly to third parties in a manner that is not visible or consented to by the user. These data include IP addresses—unique numerical identifiers assigned to ever computer connected to the internet—and records of users' activities on Redeemer's website, including searches performed, pages visited, and communications sent.  The third-party companies who receive these data use it for behavioral profiling and targeted advertising, which generates revenue for them.  In exchange for installing tracking pixels, these companies provide website operators like Redeemer with analytics about the performance of their ads on the companies' platforms, as well as additional tools for tracking visitors to their websites.

As mentioned, Doe is a Redeemer patient who used its website to search for information regarding her medical conditions.  She is also an active Facebook user, and shortly after performing those searches, she began to receive targeted advertising on her Facebook page related to her health conditions, including advertisements for arthritis treatments.  Doe never consented to the sharing of her health data with Facebook or other social media companies,

which she views as a violation of her medical privacy rights.  Moreover, in light of Redeemer's

large patient population, she believes there are numerous other Pennsylvania residents who used

Redeemer's website and whose privacy rights were likewise violated.

### B.  Notice of Removal

As required by 28 U.S.C. § 1446(a), Redeemer's notice removing this action from state

court alleged the following basis for invoking this Court's jurisdiction.  For almost two decades,

the federal government has sought to develop a nationwide infrastructure for health-related

information technology and expand the use of electronic health records.  A major component of

this federal policy is the Meaningful Use Program, which provides incentive payments to private

healthcare providers who increase patient engagement with electronic records.  This program,

originally enacted through an executive order, was later codified in the Health Information

Technology for Economic and Clinical Health Act of 2009 ("HITECH Act"), 42 U.S.C.

§ 300jj-31.  That statute earmarked federal dollars for payments to healthcare providers who

adopt the "meaningful use" of electronic health records, and it directed the U.S. Department of

Health and Human Services ("HHS") to establish criteria for what constitutes meaningful use.

Under the program devised by HHS, healthcare providers must develop and maintain electronic

records and other digital tools in order to qualify for the incentive payments, which are pegged to

specific rates of patient engagement over time.

Redeemer has participated in the Meaningful Use Program since 2013, and it uses the

patient portal accessible through its website to meet the requirements of that program.  To

increase patient engagement with its website and web portal, Redeemer utilizes many common

web practices, including targeted marketing, web beacons, and third-party analytic resources.

These tools—some of which are also used on websites maintained by federal agencies—allow

Redeemer to increase patient awareness of its digital resources and provide a more user-friendly experience for visitors to its website, thereby effectuating its obligations under the Meaningful Use Program. Thus, attempts to impose liability on Redeemer for these practices implicate the federal government's goal of increased patient engagement with electronic health records.

## II.    LEGAL STANDARD

Under the federal officer removal statute, any action commenced in state court against or directed to "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office" may be removed to federal court. 28 U.S.C. § 1442(a)(1). This statute, which has existed in some form for more than two centuries, exists "to protect the Federal Government from the interference with its operations that would ensue were a State able, for example, to arrest and bring to trial in a State court for an alleged offense against the law of the State, officers and agents of the Federal Government acting within the scope of their authority." *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Defender Ass'n*") (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007)). Removal under the statute "is to be broadly construed in favor of a federal forum." *Id.* at 467 (internal quotation marks omitted). Nonetheless, as the removing defendant, Redeemer bears the ultimate burden of establishing federal jurisdiction. *See Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004) ("The party asserting jurisdiction bears the burden of showing that at all stages of the litigation the case is properly before the federal court.").

## III.    DISCUSSION

In order to remove this action under the federal officer removal statute, Redeemer must

show that: (1) it is a "person" within the meaning of the statute; (2) Doe's claims are based on Redeemer's conduct while "acting under" the United States, its agencies, or its officers; (3) Doe's claims are for, or relating to "an act under color of federal office"; and, (4) Redeemer raises "a colorable federal defense" to those claims. *Defender Ass'n*, 790 F.3d at 467 (quoting 28 U.S.C. § 1442(a)(1)). Here, neither party disputes that the first element is met, as the Third Circuit has held that non-profit corporations like Redeemer are "persons" for purposes of federal officer removal. *Id.* at 468. But Redeemer's arguments for federal jurisdiction founder on the second.

Redeemer is not "acting under" federal officers when it designs and operates its website and patient portal. While the phrase "acting under"—like the entirety of the federal officer removal statute—must be broadly construed in favor of federal jurisdiction, "the phrase is not boundless." *Maglioli v. Alliance HC Holdings LLC*, 16 F.4th 393, 404 (3d Cir. 2021). The Supreme Court has cautioned that mere "compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official,'" and this is true even in highly regulated and supervised industries. *Watson*, 551 U.S. at 153. Rather, in order for a private party to be deemed "acting under" a federal officer, it is necessary that there was at least some "effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 152. Put another way, "the word 'under' must refer to what has been described as a relationship that involves 'acting in a certain capacity, considered in relation to one holding a superior position or office.'" *Defender Ass'n*, 790 F.3d at 468 (quoting *Watson*, 551 U.S. at 149)).

The "classic case" in which a private corporation acts under a federal officer for purposes of removal "relates to government contractors" that "help[] the government produce an item that

it need[s]." *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting *Watson*, 551 U.S. at 153). *Papp*, for example, was an asbestos injury lawsuit against Boeing relating to C-17 cargo planes that its predecessor had supplied to the military during World War II. *Id.* at 810. The Third Circuit concluded that Boeing's predecessor was "acting under" the authority of federal officers when designing and manufacturing those airplanes, reasoning that the federal government was using "a private corporation to achieve an end it would have otherwise used its own agents to complete." *Id.* at 812 (quoting *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)). Similarly, the Supreme Court has cited approvingly to a Fifth Circuit decision holding that a chemical manufacturer was "acting under" the federal government when producing Agent Orange for use in the Vietnam War. *Watson*, 551 U.S. at 153 (citing *Winters v. Diamond Shamrock Chem. Corp.*, 149 F.3d 387 (5th Cir. 1998)). This kind of assistance, the Court held, "[went] beyond simple compliance with the law and help[ed] officers fulfill other basic governmental tasks . . . . Moreover, at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153-54.

Even when a private corporation is not supplying a specific good or service to the federal government, it can still be deemed "acting under" a federal officer or agency on the basis of a "sufficiently close" relationship with that federal entity. *Defender Ass'n*, 790 F.3d at 469. That case involved the Federal Community Defender, "a non-profit entity created through the Criminal Justice Act that is delegated the authority to provide representation" by federal statute. *Id.* Through this delegation of authority, the Federal Community Defender "assists and helps the [Administrative Office of the United States Courts] carry out the duties or tasks of a federal supervisor"—namely, the provision of representation to indigent defendants, "a service the

6

federal government would itself otherwise have to provide." *Id.* Under these facts, the Third

Circuit held, there was a sufficiently close relationship between this non-profit corporation and

the federal government to warrant removal under the federal officer removal statute. *Id.* As the

court put it in a subsequent case, "[t]he community defender does more than follow federal law.

It is delegated authority to represent defendants under the Criminal Justice Act and 18 U.S.C.

§ 3599." *Maglioli*, 16 F.4th at 405 (citation omitted).

Conversely, private entities are not "acting under" the supervision of a federal officer

merely because they act in accordance with federal regulations. *Maglioli*, 16 F.4th at 404. The

ligation in that case stemmed from the deaths of nursing home resident during the COVID-19

pandemic. *Id.* at 402. While the plaintiffs pointed to various infection control measures

promulgated by federal health officials to argue that the nursing home operators were acting

under federal direction, the Third Circuit disagreed. In its estimation, there was no "acting

under" relationship in this context, as nursing homes "do not assist or help carry out the duties of

a federal superior," and they are likewise "not delegated federal authority, nor do they provide a

service that the federal government would otherwise provide." *Id.* at 405. And while nursing

homes are heavily regulated by federal entities like HHS and the Center for Medicare and

Medicaid Services ("CMS"), even "intense regulation" does not mean that they are "acting

under" federal officers. *Id.* at 405-06; *see also Watson*, 551 U.S. at 153 ("A private firm's

compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall

within the scope of the statutory phrase 'acting under' a federal 'official.' And that is so even if

the regulation is highly detailed and even if the private firm's activities are highly supervised and

monitored.").

In this case, Redeemer's actions are even further from the ambit of the federal officer

removal statute than those of the nursing home operators in *Maglioli*, let alone the defendants in *Papp* or *Defender Ass'n*.  Though Redeemer argues that its website and patient portal were created "to assist the federal government with the establishment of a nationwide system of [electronic health records]," it has no contractual relationship with any federal agency, provides no goods or services for the federal government, has been delegated no federal authority, and is not even bound by some federal mandate.  It does receive incentive payments through the Meaningful Use Program—the sole basis for Redeemer's invocation of federal jurisdiction—but those payments are not the result of a relationship in which it "helps [federal] officers fulfill [] basic governmental tasks."  *Watson*, 551 U.S. at 153.  As the HITECH Act explains, the Meaningful Use Program's purpose is to "*promote* the electronic exchange and use of health information."  42 U.S.C. § 300jj-31(a) (emphasis added).  And the regulations implementing this statute do so by providing "payment incentives . . . for eligible professionals who adopt and meaningfully use certified electronic health record (EHR) technology."  42 C.F.R. § 495.2.  Incentive payments through this program are the result of providers' voluntary compliance with HHS benchmarks.  They no more establish that their recipients are "acting under" federal officers than do tax credits for the purchasers of electric vehicles.

Moreover, the Supreme Court has explained that a key component of "acting under" federal authority being "involve[d] [in] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal supervisors."  *Watson*, 551 U.S. at 152.  Here, Redeemer identifies no such federal duties or tasks.  While Redeemer argues that the HITECH Act and its resulting regulations reflect a policy goal of promoting the use of electronic health records, it does not argue that Congress either mandated a migration from paper to electronic health records or authorized any actions by the federal government in the event that private providers declined to do so

voluntarily.  Thus, it cannot be said that providers who participate in the Meaningful Use Program "assist" or "help carry out" some federal duty or task.

Attempting to show otherwise, Redeemer argues that providers who receive payments through the Meaningful Use Program are akin to "government contractors [who] voluntarily provide services under federal specifications to obtain payment from the government."  But there are several problems with that argument.  For one, being a government contractor does not automatically entitle a private entity to federal officer removal; the contractor's work must "fulfill other basic government tasks" that, absent its assistance, "the Government itself would have had to perform."  *Id.* at 153-54; *see also id.* at 157 ("Without evidence of some [] special relationship, [Defendant's] analogy to Government contracting breaks down.").  Again, neither the HITECH Act nor any other statute or regulation cited by Redeemer authorized a "basic government task" that the federal government would have performed itself absent the assistance of providers like Redeemer.  But more importantly, the Meaningful Use Program—a voluntary program—mandates no actions by providers, and its financial benefits are designed to incentivize, not require, participation.  This is markedly different than the government contract at issue in *Papp* or the express delegation of authority in *Defender Ass'n*.  *See Mohr v. Trustees of Univ. of Pa.*, 2023 WL 3044594, at *4 (E.D. Pa. Apr. 20, 2023) ("[F]inancial incentives alone do not create an unusually close relationship that involves 'subjection, guidance, or control.'").

Next, Redeemer cites as "instructive" *Doe I v. UPMC*, 2020 WL 4381675 (W.D. Pa. Jul. 31, 2020), one of the only cases to conclude that providers are "acting under" federal officials when they participate in the Meaningful Use Program.  *Id.* at *7; *see also Doe v. ProMedica Health Sys., Inc.*, 2020 WL 7705627, at *3 (N.D. Ohio Oct. 30, 2020) (adopting *UPMC*'s holding without further analysis).  That case is both non-precedential and unpersuasive.  Its

reasoning turns on the same improper analogy between voluntary incentive programs and governmental contracts discussed above to conclude that "the relationship between UPMC and DHHS is less like the regulator-regulated relationship in *Watson* and more like the government contractor relationship in *Papp*." 2020 WL 4381675, at *6. This is unpersuasive for the reasons previously discussed, and the case's conclusions regarding the Meaningful Use Program have been properly rejected by the vast majority of district courts to considered them.[1]

Finally, Redeemer makes the point that discretionary actions can be part of an effort to carry out federal duties and tasks, and that a private entity need not be acting at the specific direction of federal officials to be "acting under" them for purposes of federal officer removal. This is true insofar as it goes—presumably the contractor in *Papp* was never specifically directed to use asbestos in its airplane designs, and the Third Circuit rejected the notion that "the complained-of conduct [must be] done at the specific behest of the federal officer or agency." 842 F.3d at 813. But as the court went on to explain, discretionary actions fall within the federal officer removal statute when they are part of a broader course of conduct that is at "the direction of a federal officer or agency." *Id.*; *see also Defender Ass'n*, 790 F.3d at 470 ("It is sufficient for the 'acting under' inquiry that the allegations are directed at the relationship between the [defendant] and the [federal official]."). Here, because Redeemer's actions were part of a

---

[1] *See Mohr*, 2023 WL 3044594, at *5; *Doe v. BJC Health Sys.*, 2023 WL 369427, at *4 (E.D. Mo. Jan. 10, 2023); *Quinto v. Regents of Univ. of Cal.*, 2023 WL 1448050 (N.D. Cal. Feb. 1, 2023); *Heard v. Torrance Mem'l Med. Ctr.*, 2023 WL 2475544, at *3 (C.D. Cal. Mar. 13, 2023); *Doe v. Torrance Mem'l Med. Ctr.*, 2023 WL 2916548, at *3 (C.D. Cal. Apr. 12, 2023); *Crouch v. Saint Agnes Med. Ctr.*, 2023 WL 3007408, at *4 (E.D. Cal. Apr. 19, 2023); *Doe v. Cedars-Sinai Health Sys.*, 2023 WL 3059141, at *3 (C.D. Cal. Apr. 24, 2023); *Browne v. Cedars-Sinai Health Sys.*, 2023 WL 3095551, at *3 (C.D. Cal. Apr. 26, 2023); *Doe v. Hoag Mem'l Presbyterian Hosp.*, 2023 WL 3197716, at *3 (C.D. Cal. May 2, 2023); *Beltran and Reingold et al. v. Cedars-Sinai Med. Ctr.*, 2023 WL 3620740, at *2 (C.D. Cal. May 24, 2023); *Davis v. Hoag Mem'l Hosp. Presbyterian*, 2023 WL 4147192, at *3 (C.D. Cal. June 23, 2023); *Valladolid v. Mem'l Health Servs.*, 2023 WL 4236179, at *5 (C.D. Cal. June 27, 2023); *Beauford v. Johns Hopkins Health Sys. Corp.*, 2023 WL 4237373, at *4 (D. Md. June 28, 2023); *Martin v. LCMC Health Holdings, Inc.*, 2023 WL 4540547, at *6 (E.D. La. July 5, 2023); *Progin v. Umass Mem'l Health Care, Inc.*, 2023 WL 4535129, at *5 (D. Mass. July 13, 2023); *Doe v. Mosaic Health Sys.*, 2023 WL 5125078, at *5 (W.D. Mo. July 20, 2023); *Horton v. Willis-Knighton Med. Ctr.*, 2023 WL 5346133, at *7 (W.D. La. July 27, 2023).

voluntary incentive program, it was not "acting under" the direction of any federal officer or agency.

**IV.     CONCLUSION**

For the foregoing reasons, Doe's motion to remand this case to the Court of Common Pleas of Philadelphia County, Pennsylvania will be granted.

An appropriate order follows.

**BY THE COURT:**


*/s/ Wendy Beetlestone*
_____
**WENDY BEETLESTONE, J.**